1  **RISNER & GRAHAM**  #00089200
   Attorneys at Law
2  100 North Stone Avenue, Suite 901
   Tucson, Arizona 85701-1620
3  (520) 622-7494
   **WILLIAM J. RISNER, ESQ.**
4  State Bar Number: 002257
   Pima County Bar Number: 48228
5  **KENNETH K. GRAHAM, ESQ.**
   State Bar Number: 007069
6  Pima County Bar Number: 21588
   *Attorneys for Plaintiffs*
7
   **JESUS ROMO VEJAR**
8  Jesus Romo Vejar, P.C.
   177 N. Church Ave., Ste, 200
9  Tucson, AZ 85701
   *Attorney for Plaintiffs*
10                    UNITED STATES DISTRICT COURT

11                         DISTRICT OF ARIZONA

12
   **GUADALUPE GUERRERO, for**        NO. CV-12-00370-TUC-JAS
13 **and on behalf of the statutory**
   **beneficiaries of the deceased**  **PLAINTIFFS'  POST  TRIAL**
14 **CARLOS LAMADRID,**               **MEMORANDUM**

15
        **Plaintiffs,**
16
   -vs-
17                                    Assigned to: James A. Soto

18 **THE UNITED STATES OF**
   **AMERICA,**
19
        **Defendant.**
20

21        This Federal Tort Claims Act (FTCA) wrongful death lawsuit was tried to the

22 court before the Honorable James A. Soto during seven days from July 20 through

23 July 28, 2015.  Having received the entire trial transcript from the court reporter the

24 plaintiffs in their Memorandum discuss relevant legal and factual issues concerning

25 liability and damages.

26

## I.   Liability

### A.   Battery

It is undisputed that Agent Tidwell's shooting and killing Carlos was a battery under Arizona law.  The remaining issue on the intentional tort claim is whether that battery was justified.

**Arizona Justification Statutes**

It is important to understand Arizona's justification statutes as it is clear, as a matter of law, that the shooting of Carlos LaMadrid was not justified even under the defendants theory of the case.

A.R.S. § 13-404(A) provides as follows:

Justification; self defense

A.   Except as provided in subsection B of this section, a person is justified in threatening or using physical force <u>against another</u> when and to the extent a reasonable person would believe that physical force is <u>immediately necessary to protect himself against the other's</u> use or attempted use of unlawful physical force." (Emphasis added)

This statute makes clear that a person is justified in using physical force against another person only if a reasonable person would believe physical force is immediately necessary to protect himself against the <u>other person's</u> use or attempted use of physical force.  It does not justify a person using physical force against someone who is not using or threatening to use physical force against them.

A.R.S. § 13-405(A), provides as follows:

Justification; use of deadly physical force.

A.   A person is justified in threatening or using deadly physical force against another:

1.   If such person would be justified in threatening or using physical force against the other under section 13-404, and

2.   When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force.

This statute clarifies when a person is justified in threatening or using deadly force against another.  It therefore incorporates the provisions of A.R.S. § 13-404 and emphasizes that deadly physical force can only be used against another person if it is immediately necessary to protect themselves from that other person's use of deadly physical force.  Again, this statute does not allow deadly physical force to be used against a person not threatening deadly physical force.

A.R.S. § 13-409, provides as follows:

> Justification; use of physical force in law enforcement
>
> A person is justified in threatening or using physical force against another if in making or assisting in making an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of that person, such person uses or threatens to use physical force and all of the following exist:
>
> 1.  A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.
>
> 2.  Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.
>
> 3.  A reasonable person would believe the arrest or detention to be lawful.

This statute only justifies the use of physical force against another person in making or assisting an arrest or detention or in preventing or assisting in preventing the escape after arrest or detention of a person, and, only if that person uses or threatens to use physical force, and, all three of the other conditions exist.  It does not apply where some person other than the person to be arrested or person who is escaping is using or threatening to use physical force.

The defendant has stated it is relying upon A.R.S. § 13-410(C)(1).  This provision provides as follows:

> C.  The use of deadly force by a peace officer against another is justified pursuant to section 13-409 only when the peace officer reasonably believes that it is necessary:

1.   To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.

However, this provision refers to the use of force pursuant to 13-409 which only allows the use of force <u>where the person to be arrested</u>, or is trying to escape, is using physical force.

Under Arizona law, even under the defendant's theory of the case that a person or persons were on top of the fence throwing rocks at Agent Tidwell, he was not justified in shooting and killing Carlos.

In addition, even assuming that a person can be justified in shooting someone other than the person who is using or threatening to use deadly force against that person, the defendant has failed to prove deadly force was used in this case or that it was immediately necessary to use to use deadly force.

A.R.S. § 13-105(14) provides as follows:

14.   "Deadly physical force" means force that is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use is capable of creating a substantial risk of causing death or serious physical injury.

While throwing a rock can be deadly physical force, not every rock that is thrown can cause death.  In this case, even if you assume for sake of argument that rocks were thrown, the defendant has put on no evidence to establish that the rocks allegedly thrown by an individual on the fence were either (1) being used with the purpose of causing death or serious physical injury; or (2) in the manner of their use or intended use were capable of creating a substantial risk of causing death or serious physical injury.

First, there is no evidence that the alleged rock thrower threw the rocks with purpose of causing death or serious physical injury.  Second, there is no evidence as to how fast a rock, even of the size Sgt. Ritchie randomly picked up from the area

4

of this incident, would have to be traveling in order to cause death or serious physical injury from the distance thrown.  Third, the assertion that the rocks were allegedly thrown with any significant velocity is belied by the facts.  In order to throw an object with any substantial velocity, one has to be able to step into the throw or at least be able to transfer weight into the throw.  In order to be able to transfer weight into the throw, the alleged rock thrower would have had to be in a position clearly visible to Agent Tidwell. i.e. the rock thrower could not have been below the fence top.

In addition, that person would have had to have a supply of rocks to throw.  How does one hold onto a fence with rocks in one hand and throw with any velocity with the other arm.  Photos of the scene do not show rocks on the south side of the border in the area of the shooting.

As set forth in this memorandum, the defendant has the burden of proving justification.  It has provided this Court with no evidence that the rocks it alleged were thrown were capable of causing death or serious physical injury.

"Serious physical injury" is defined as including "physical injury that <u>creates a reasonable risk of death</u>, or <u>that causes</u> serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the functions of any bodily organ or limb."  13-105(38).

It is important to note that this definition reads such that the "deadly force" can constitute "serious physical injury" if the injury "creates a reasonable risk of death", but, must actually cause, not create a reasonable risk of, serious and permanent disfigurement, serious impairment of the functions of any body organ or limb."

In considering whether the defendant has met its burden of proof, this Court

should consider the defendants' failure to preserve the scene, which failure makes it hard to know what distances were involved, and the size and weight of the rocks allegedly thrown, where those alleged rocks landed, or how much force would have been needed to propel a rock that distance. No evidence was produced that there was a "substantial risk" that a rock, that was large enough to cause death with sufficient accuracy to hit someone's head, presumably the only portion of the body that could be struck and cause "death or serious physical injury," was thrown.  Agent Tidwell did not even know where the three rocks, he allegedly saw, landed.  There is no evidence they almost hit him.

Agent Tidwell testified he saw Carlos LaMadrid get out of his vehicle and run towards the ladder.  (R.T. 7/20/15, pg. 81:10-23). Tidwell knew that the goal of LaMadrid was to reach the other side of the fence.  Tidwell shot Carlos LaMadrid four times in his back with his .40 caliber H&K service handgun as LaMadrid was climbing the ladder.  Three of the hollow point bullets remained in Mr. LaMadrid's body.  The fourth bullet was unaccounted for but had grazed his upper left shoulder. (Plaintiff's Exhibit 4)

On March 24, 2011, Cochise County Detective John Gjerde, and Detective Fillippelli met a border patrol investigator and together they examined the fence where Mr. LaMadrid was shot and found the bullet splatter from the fourth bullet 103 inches from the base of the fence and 29.5 inches below the top of the fence. (Plaintiff's Exhibit 26).  That marking made after the bullet grazed the top of LaMadrid's left shoulder serves as a mark to show the height achieved by Mr. LaMadrid. Marty Fuentes, plaintiff's expert, measured the road surface as 18 inches higher than the fence bottom at the ground.  Thus, LaMadrid was shot when his shoulder was 95 inches or approximately 7.9 feet higher than the road surface.

Mr. Fuentes estimated that Tidwell was 11 to 13 yards away from Mr. LaMadrid.  Considering Tidwell's own height the shots were straight ahead, unobstructed and only slightly elevated.  Fuentes estimate was based on an assumption that Tidwell shot while behind his vehicle.  If he shot as Gonzalez claimed he was much closer.

Agent Tidwell was aware that in the United States it is unlawful to shoot someone to try and stop them from climbing a ladder if they think the person is trying to evade a drug charge.  (R.T. 7/20/15, pg. 84:1-13).  Because of potential criminal charges against Agent Tidwell, he first explained why he shot Mr. LaMadrid in a written sworn statement on December 20, 2013, around two years and nine months after the shooting.  (Plaintiff's Exhibit 27).  In his hand written statement he explained on page 3:

> "I remember the wind and sand hitting my face.  At the top of the fence I saw a bulge, silouettes of person(s).  It was hard to tell because of the sun.  I noticed a projectile or a motion consisting of throwing a rock at me and fired 3-5 rounds from my service issued weapon at the location."

The justification of Agent Tidwell will be examined in detail in this memorandum.  The first issue, however, is to examine the difficulties determining many details because of the immediate organized destruction of evidence by the border patrolmen and police.

**Destruction and Spoilation of Evidence**

One of the fundamental principles of all homicide crime scenes is to preserve the evidence at the scene unmolested.  Marty Fuentes described those principles as did all the officers who were asked.  Cochise County Sgt. Ursula Ritchie, who eventually was in charge of the investigation, testified that the basic rule of crime scene preservation is to not move anything, to keep it basically in pristine condition

as much as possible.  (R.T. 7/22/15, pg. 97:12-16).

Amazingly, Lucas Tidwell himself, was permitted to get back in his Border Patrol "Tahoe" vehicle only 1 minute and four seconds after shooting Mr. LaMadrid, as noted on the video of the shooting.  He moved it to a location far away from the shooting scene.  (R.T. 7/20/15, pg. 106:1-7; Plaintiff's Exhibit 7, Border Patrol Video Camera 7 @ 12:12:34; Plaintiff's Exhibit 14 video 254 beginning @ 5 seconds).  A few minutes later Douglas Police Department Officer Ray Miramontes drove LaMadrid's Avalanche vehicle away from the scene.  (R.T. 7/23/15, pg 55:16-20; Plaintiff's Exhibit 7, Border Patrol Video, Camera 6 @ 12:16:40-12:17:00).  The 14' metal ladder was still leaning up against the fence.  (R.T. 7/23/15, pg. 106:1-2).  Another officer later laid the ladder down from its location leaning on the fence.  Sgt. Ritchie found the ladder resting on the ground eight feet away from the fence.  (R.T. 7/22/15, pg. 104:1-4).

In order to understand how and why the crime scene was immediately destroyed the persons present should be identified.  Immediately at the scene was apparently the entire Douglas Police Department.  DPD officer Marcus Gonzalez testified that a typical Douglas Police Department shift is four or five and a maximum 6 officers.  (R.T. 7/24/15, pg. 20:2-7).  The chase of the Avalanche involved five separate DPD vehicles.  Gonzalez testified that he was first in line behind the Avalanche.  Next in line was Sgt. Kulkins, then Officer Martin Villa, followed by Officer Clemente Rodriguez and finally Ray Miramontes.  (R.T. 7/23/15, pg. 123:18-24).  Before the border, Sgt. Kulkins diverted a few blocks but was present at the scene quickly and before any vehicle was moved.  (Ex. 14, video 254).  Later DPD Lietenant Fullen arrived and immediately requested DPD dispatch to alert Agua Prieta police to come to their side of the border.  (R.T. 7/24/15, pg.

1    36:16-25, 37:1-2; Plaintiff's Exhibit 6 audio 1157).

2        Plaintiff's Exhibit 14 still-photo is time stamped at 3 seconds after the person
3    who recorded the anonymous video began recording clearly shows 3 border patrol
4    vehicles, 2 Douglas Police patrol cars and one unmarked police vehicle at the scene
5    prior to Tidwell moving his vehicle.  The Douglas Fire Department record states that
6    it was the border patrol who reported:  "BP reported pt was shot twice".  (Plaintiff's
7    Exhibit 1 pg. 2).

8        This shooting occurred on perhaps the most monitored street in Arizona.  The
9    Douglas Border Patrol Station was the largest in the nation.  This area just east of the
10   Port of Entry had a patrolman assigned to each block.  Agent Tidwell was assigned
11   that day to "Rose Ditch" (R.T. 7/20/15, pg. 53:1-3).  One block east and about 200
12   yards is Cochise Street. (R.T. 7/20/15, pg. 54:1-3) On that day Cochise did not have
13   an assigned agent, but there is an agent assigned to Dallas, the next block on certain
14   days. (R.T. 7/20/15, pg. 54:8-16).  Cameras and lights on tall poles monitor the area
15   and all agents on the east side of the Port of Entry listen to a single radio channel
16   "Burn 1."  (R.T. 7/20/15, pg. 151:17-25; 152:12-22).  Border Patrol agents were
17   alerted to the chase over "Burn 1" channel including when the Avalanche turned
18   south on Cochise heading toward the fence. (R.T. 7/21/15, pg. 11:16-21; 12:1-11).

19       Plaintiff's Exhibit 25 is Supervisory Border Patrol Agent Jorge Roman's
20   memorandum of March 21, 2011 to Randy Hill, Chief Patrol Agent of the Tucson
21   Sector. SBPA, Jorge Roman reported that he arrived at the scene "at approximately
22   12:11 p.m.," the very minute that Mr. LaMadrid was shot and before the Tahoe
23   vehicle had been moved.  His memorandum reports that "at approximately 12:15
24   p.m., Field Operations Supervisor (FOS) Kevin Smith and Supervisory Border Patrol
25   Agent Ryan Holden arrived on scene.  The scene was secured and a perimeter was

26

1   established." (Plaintiff's Exhibit 25, pg. 2).  BPA, John Jameson testified that he

2   was broadcasting what he was observing on his video monitor.  He broadcasted "the

3   scene is, looks secure.  Multiple agents in the area, no visual of any subjects, they all

4   TBSed." (R.T. 7/22/15, pg. 32:10-19; Plaintiff's Exhibit 7, CCSO Report, Border

5   Patrol Communications, Recording 14).

6         Sgt. Ritchie of the Cochise County Sheriff's Office eventually took charge of

7   the crime scene.  She testified that the border road area was not in the jurisdiction of

8   the Douglas Police Department.  Agent Presnall testified that if high ranking border

9   patrol personnel were present we can infer, they were in charge of the crime scene.

10  Such persons were immediately present.

11        In view of the presence of a large number of experienced law enforcement

12  personnel, including detectives and supervisory personnel, why was the important

13  evidence at the scene destroyed?  The reasons offered were not only insubstantial but

14  preposterous.  The preposterousness itself is revealing of the true motive.

15  **The Ladder**

16        The fourteen foot metal ladder remained leaning on the sturdy border fence

17  even after Mr. LaMadrid had been shot and fell off on top on Manuel Chino Lino.

18  Officer Rodriguez testified that the ladder was still standing at the time they pulled

19  LaMadrid and Chino Lino away from the fence. (R.T. 7/23/15, pg. 105:25; 106:1-2)

20  Ursula Ritchie was told the ladder was moved because of "high winds and safety

21  issues.  They said it could fall." (R.T. 7/22/15, pg. 105:12-15; 106:22-25; 107:1-3).

22  It would take hurricane winds to blow such a metal ladder over and the four videos

23  do not show excessively strong wind, especially Plaintiff's Exhibit 14, the

24  "anonymous" video,  which is incredibly clearer than the Border Patrol videos

25  presented.  The ladder either was or should have been inside the secured scene

26                                                    10

described by Supervisory B.P. Agent Roman.  Any safety issue would have been faced by the scene investigator only and he or she should have marked and photographically recorded its location before it being moved.  The same goes for both of the vehicles.

**Vehicles**

Agent Tidwell should not have been permitted to remain near his vehicle.  He testified that he mentioned to either the Cochise County Sheriff's Office or the Douglas Police that he was going to move his vehicle due to his fear of people on the south side of the fence.  (R.T. 7/20/15, pg. 106:1-7; pg. 106:14).  There were no people on the south side of the fence at that time other than the eye witness construction workers on a roof across the street from the fence itself and dozens or armed officers.  The "tall thin guy" had already left due to the guns pointed at him.  (Plaintiffs Exhibit 14, video 254 @ 5 seconds and still photos 2,3,4,5 and 7; Plaintiff's Exhibit 7, CCSO Report, YouTube Video, still photo 9)[1] If Tidwell personally had fear he could have moved back or requested to leave the scene.  His removal of the Tahoe in the midst of those officers must have been approved, but it was certainly not objected to.  The Avalanche was itself later moved as well.  (Plaintiff's Exhibit 7, CCSO Report, Border Patrol Video, Camera 6 @12:16:40).  This completed the removal of all the key evidence.

Douglas Police Officer Ray Miramontes testified that he moved the Avalanche because he thought the presence of the Avalanche near the fence with a small backpack with less than 50 pounds of marijuana in it was a threat by the possibility

---

[1] The Court is advised that the still photos can be brought up electronically on the disc provided of the Trial exhibits and the Court can double click on the photos which will enable the capability of zooming in and out of the photo by using the "ball" on the mouse.

that Mexican drug dealers could come with a tow truck, ram the fence, attach chains to the fence, pull the fence down, and then drive in and attach tow straps to the Avalanche and take it to Mexico, all while the vehicle was surrounded by dozens of fully armed officers.  Officer Miramontes was a 17 year veteran with the Douglas Police Department.  (R.T. 7/23/15, pg. 57:22-25; 58:1-17).  (R.T. 7/23/15, pg. 44:2-5, 15-18).

Officer Miramontes professed reason is beyond delusional.  No Douglas Police veteran could believe such a thing.  Its very absurdity, combined with the other absurd reasons for the destruction of the crime scene clearly demonstrates that the destruction was intentional.  Plaintiffs infer that the motivation was to assist Agent Tidwell by complicating and hampering any criminal investigation.  Nonetheless, the actions of those agents and officers negatively affected plaintiffs ability to clearly establish important details of the shooting event.

This court should draw a negative inference from the spoilation of evidence at the crime scene.  A long line of Arizona cases state that the Court should instruct the jury that it can draw a negative inference against the party who fails to preserve evidence.  State v. Willits, 96 Ariz. 184, 393 P2nd 274 (1964).  This is because the Arizona courts recognize that parties have a duty to preserve evidence:

> Litigants have a duty to preserve evidence which they know, or reasonably should know is relevant in the action, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

Souza v Fred Carries Contracts, Inc. 191 Ariz. 247, 955 P.2d 3 (App. 1997).

The Ninth Circuit recognizes this duty as well.  See National Association of Radiation Survivors v Turnage, 115 F.R.D. 543, 556-67 (N.D. Cal. 1987) (where one party wrongfully denies another evidence necessary to establish a fact in dispute,

"the court must draw the strongest allowable inferences in favor of the aggrieved party," and holding that "one party litigant is under a duty to preserve that it knows, or reasonably should know is relevant in the action"); Akiona v U.S., 938 F.2d 158 (9th Cir. 1991), Unigard Security Ins. Co. v Lake Engineering & Manufacturing Corp., 982 F.2d 363 (9th Cir. 1992) (holding that an insurer's evidence was properly excluded at trial where the company failed to preserve evidence-even though the court made no finding that the insurer acted in bad faith Glover v BIC Corp. , 6 F3d 1318 (9th Cir. 1993) (holding that a party need not prove bad faith before a presumption arises that the destroyed evidence's condition was unfavorable to the party responsible for the spoliation).

Aside from the above mentioned destruction of key evidence, no effort was made to preserve the location of the shooting incident until an hour and a half later when Sgt. Ritchie arrived at the scene.  The potential evidence lost included the footprints of where Tidwell was standing when he shot his weapon.  Most of the incident occurred on a dirt road where foot prints and tire tracks are easier to locate. In Plaintiffs Exhibit 7, CCSO Report, Border Patrol videos, Camera 7, @ 12:13:06 it appears a DPD Patrol vehicle is being backed up from its original resting place; @12:13:19 it appears a Border Patrol vehicle that is facing West is being moved from its resting place; @ 12:13:37 it appears another Border Patrol vehicle that is facing East is backing up in the area where the spent casings were allegedly found. In the same exhibit but from the other view Camera 6, @ 12:12:18, it appears a Border Patrol vehicle approaching the shooting scene from the West drives in the area where the spent casing where found.  In Plaintiff's Exhibit 7, CCSO Report, YouTube video @ 2:54, you can observe another Border Patrol vehicle driving over the incident scene and any potential footprint and tire track evidence.  You can also

see there are no cones or tape in place to keep traffic off of International Road.  At 3:35 of the same video, you can observe yet another Border Patrol vehicle driving over the incident scene.  Again, no cones or restriction tape in place to preserve basic key evidence in a shooting incident but yet you can see by all of the above citations the heavy border patrol presence.

Under certain circumstances the location of spent cartridges can help determine the general location of a shooter, but not in this case.  Agent Tidwell shot through his own windshield either when he was inside his vehicle or just outside his door.  In either case that spent cartridge should have been found inside the Tahoe or next to it.  Instead, all five spent cartridges were allegedly found near each other.  If one was moved they all could have been moved.  Thus the evidentiary value of the cartridges is devalued.  Tidwell's testimony that he did not know he had fired his weapon through the windshield is not credible.

In addition, the method and manner of taking Agent Tidwell's statement in Deming, New Mexico is suspicious where everyone sits around talking without any recording and then Agent Tidwell is allowed to write his own statement.  In what other situation does a law enforcement agent act in this manner?  The government certainly taped Mr. Chino-Lino's statement when they suspected him of involvement.  The government delayed this case for a couple of years while conducting a criminal investigation where the interrogation is aa non-recorded session and a carefully crafted statement.

**Was Anyone On Top of the Fence and Were Any Rocks Thrown at Tidwell's Vehicle?**

Not one of the Border Patrol or the Douglas Police Department recorded communications mention anyone on top of the fence much less someone throwing

14

rocks.    (Plaintiff's  Exhibit  7,  CCSO  Report,  Border  Patrol  Communication;

Plaintiff's Exhibit 6, Douglas Police Audio Communications).

BPA, Jameson was manning the cameras, along with Eric Hopkins, at the time

of the incident.  (R.T. 7/20/15, pg. 91:17-25).  They both had the capability to

broadcast and Jameson was broadcasting over the radio whatever he was seeing.

(R.T. 7/20/15, pg. 251:17-25).

From his memory of the event, Jameson did not see anyone on top of the

fence.  (R.T. 7/21/15, pg. 13:12-19).  Jameson did not see anyone that appeared to

be throwing rocks or any objects.  (R.T. 7/21/15, pg. 13:23-25).  By memory,

Jameson recalled seeing only one person on a ladder and that ladder was on the U.S.

side.  (R.T. 7/21/15, pg. 14:1-8).  In fact, the only mention of someone on top of

something is the Douglas Police Communication from Douglas Police Officer

Marcus Gonzalez, in which he states, "we got two units on top of the roof."

(Plaintiff's Exhibit 6A, Recording 1166).

Due to the height of the fence any person or persons actually on top of the

fence would have been highly noticeable and visible from a great distance.  Such a

person would have been noticeable to Tidwell as he slowly drove toward Cochise

Street.  Credible evidence does not support a conclusion that individuals were on top

of the fence nor that anyone was throwing rocks at Tidwell's vehicle from the top of

the fence.

**Tidwell's Testimony Regarding Rocks**

Lucas Tidwell testified that he was "not aware" that a rock had hit his

windshield until after he had moved his vehicle.  (R.T. 7/20/15, pg. 84:23-25).

Tidwell testified he was in the process of getting out of his vehicle, about half-

way in and half-way out, having his foot on the ground when he saw the rocks

coming at him.  (R.T. 7/20/15, pg. 83:6-10).  He saw the rocks go over him but he did not know where those rocks landed.  (R.T. 7/20/15, pg. 85:5-8).  When Tidwell was still in his seat he had seen Carlos LaMadrid get out of his vehicle and run towards the ladder.  Tidwell did not see any persons above the ladder at that time.  (R.T. 7/20/15, pg. 81:10-23).  Tidwell also saw the second person run by the passenger door of the Avalanche towards the ladder.  (R.T. 7/20/15, pg. 82:1-9).

When Tidwell saw those two rocks travel over him he testified that he ducked and used his vehicle's door for protection.  (R.T. 7/20/15, pg. 85:23-23; 86:13-20).  As soon as Tidwell stood up, he said he immediately saw a projectile come towards him so he had to duck again.  He also saw a "silhouette" but did not see the "silhouette" throw a projectile.  (R.T. 7/20/15, pg. 88:15-23).

Tidwell testified he did not see any person throwing a rock or make a throwing motion.  He only saw something coming from that direction.  (R.T. 7/20/15, pg. 90:12-15).  It was when the "third rock" flew over Tidwell that he claimed to have sighted in on the top of the fence with his pistol.  (R.T. 7/20/15, pg. 101:1-10).

The "third" object landed behind him somewhere but he does not know how far because he didn't look behind him.  (R.T. 7/20/15, pg. 99:9-12).  Tidwell testified that when he got back up from ducking he was aiming at the silouette at the top of the fence.  He saw another "throwing motion."  He can't recall if it was a rock or a throwing motion.  Then he fired his weapon.  He claimed to fear for his life.  (R.T. 7/20/15, pg. 93:13-23; 95:2-6).

When Tidwell had gotten up the second time he said he was already zeroed in on the top of the fence.  (R.T. 7/20/15, pg. 94:2-8).  Tidwell is not sure if he noticed a projectile or a motion consisting of throwing a rock.  It all "happened very fast."

1   (R.T. 7/20/15, pg. 116:21-23).

2      In summary, Tidwell testified about three rocks.  All three passed over him

3   and he did not know where they landed.  All three were seen as he was next to his

4   car door using it as protection.  If one of those rocks had hit his windshield and

5   shattered glass over his cars interior while he was kneeling just outside or getting out

6   of his vehicle one leg-in one leg-out one would expect that it would not have been

7   possible to have been unaware of that occurrence.  Yet, Tidwell is clear that the three

8   rocks sailed over him and that he became aware of the broken window only after he

9   had moved his vehicle to the north.

10      If, another person or persons, the referenced "bulge" or "silhouette", had been

11   real people and his true target, Tidwell should have immediately known that he hit

12   the wrong guy and he should have focused on what that alive person or alive persons

13   were doing.  However, Tidwell provided no testimony of where those persons went,

14   or any description of him or them whatsoever, even though he was focusing on that

15   very spot and was standing only 25 or 30 feet away.

16      Tidwell did recall seeing people on one roof top after the incident.  (R.T.

17   7/20/15, pg. 72:1-5).  But he does not recall the person or persons on the fence in

18   front of him.

19      The time sequence offered by Tidwell does not match his rendition of the

20   facts.  Carlos LaMadrid was a good athlete in multiple sports.  He was motivated to

21   climb the fence on the sturdy heavy metal ladder directly in front of his car.  Tidwell

22   testified he observed Carlos LaMadrid run in front of his vehicle towards the ladder

23   while Tidwell was still in his seat.  (R.T. 7/20/15, pg. 81:10-23).  Tidwell claims he

24   was trying to get out of his car one leg in and one leg out when he claimed to have

25   seen two large objects fly over his head.  R.T. 7/20/15, pg. 82:18-25).  He claimed

26

1    he went to his knees at that point.  (R.T. 7/20/15, pg. 85:18-21; 113:15-19).  As soon
2    as he stood back up he claimed to have seen another projectile come towards him so
3    he had to duck again.  (R.T. 7/20/15, pg. 88:15-23).  Tidwell aslo testified that he
4    saw LaMadrid scaling the fence the "first time he got up."  R.T. 7/20/15, pg. 89:6-
5    15).  Having seen LaMadrid scaling the fence the first time he got up he had to duck
6    again for the additional "projectile,"

7         Tidwell then claimed he got up again and moved further back several feet to
8    access the situation.  He claimed he backed up because he didn't know who might
9    be behind him.  (R.T. 7/20/15, pg. 93:4-8).  Tidwell claimed he shot from that
10   position after the "third rock" went over his head somewhere and he saw another
11   motion as if throwing.  (R.T. 7/20/15, pg. 101:1-10).

12        Officer Gonzalez, on the other hand, testified Tidwell came out of his vehicle
13   with his hand on his pistol and his hand came up in an aiming position.  (R.T.
14   7/23/15, pg. 12:13-22).  Gonzalez testified that Tidwell "was just outside of the
15   driver door or getting out of his driver door as he fired the shots."  (R.T. 7/23/15, pg.
16   141:3-4).  Gonzalez testified he did not recall seeing Tidwell go to his knees outside
17   Tidwell's door.  (R.T. 7/24/15, pg. 14:19-20).  Plaintiff's Exhibit 7, CCSO Report
18   photos 57, 58, 59 and 60 do not show any dust or dirt anywhere on Tidwell's
19   uniform.

20        On the question of where Tidwell was located when he fired the shots, Officer
21   Gonzalez's testimony comes closet to explaining how Carlos LaMadrid's shoulder
22   was only 8 feet 3 inches from the ground.  If Tidwell had been up and down a couple
23   of times and retreated backward while "assessing the situation", LaMadrid would
24   have had enough time to be swinging over the 45 degree projection and not only part
25   way up the ladder.

26

1    In the video Tidwell can be seen with his arm raised backing up from his car.

2  The view of Tidwell as he backed away may show his continued focus on the area

3  in front of him which included a good view of persons in Mexico.

4    If he was backing up his continued focus would have placed him in the best

5  position to see any persons on or near the fence and to have seen where they went.

6  If, on the other hand, he had fired from that position as he was backing up and

7  looking directly at the fence.  A "silhouette" or "bulge" would have been clearly

8  identifiable and easy to describe.  The conclusion is unavoidable that the only person

9  he identified  is the one that he shot as he was climbing a ladder and threatened no

10  one in any manner.  The only "threat" was that he might escape to Mexico.

11  **Douglas Police Officer Marcus Gonzalez**

12    DPD officer Marcus Gonzalez was the first officer in line behind the gold

13  Avalanche.  He is now a detective assigned to the Homeland Security Investigations

14  Task Force.  (R.T. 7/23/15, pg. 121:14-20).  Gonzalez testified that he saw two men

15  on top of the fence, one on each side of a ladder as he arrived from about 100 yards

16  away.  (R.T. 7/23/15, pg. 125:5-18).  He testified that he saw another person in

17  Mexico on the ground, but, he never determined where the person went.  (R.T.

18  7/23/15, pg. 132:7-18).  He concluded that the person he thought was on the ground

19  next to the fence "may have been a figment of my imagination." (R.T. 7/23/15, pg.

20  149:1-6).

21    He testified that he saw two people on top of the fence.  One to the east of the

22  ladder and one to the west.  He only saw one ladder, the one in exhibit which

23  LaMadrid was climbing when shot. (R.T. 7/23/15, pg. 126:10-15. He described the

24  person to the west on top of the fence as sitting straddling the fence sideways with

25  one leg on each side of the 45 degree angle extension on top of the fence that angles

26

into the U.S.  That person, who was straddling the fence, was "bent over" trying to grab or help LaMadrid who was in the process of climbing the ladder. (R.T. 7/23/15, pg. 138:3-22).

When Officer Gonzalez heard the shots fired, he claimed the guy sitting on the fence to the west fell down to the ground in the U.S. having been pulled down by Mr. Lamadrid.  (R.T. 7/23/15, pg. 140:7-13).

That person, who had been allegedly straddling the fence, was identified as Manuel Chino-Lino.  (R.T. 7/23/15, pg. 58:13-22).  Since we know from other witnesses that Manuel Chino Lino was in the back of the Avalanche it is clear that a person sitting on the top of the fence straddling the fence was surely another figment of Gonzalez's imagination.

The other person he claimed to see on the east side of the ladder, he claimed either fell or jumped off the fence and limped away across the street and got into a silverish or white hatchback vehicle parked across Calle International in Mexico. (R.T. 7/23/15, pg. 145:1-21).  That person was not carrying anything. (R.T. 7/23/15, pg. 149:17-18).

The only person Gonzalez allegedly saw throwing a rock was the person he claimed to have seen on top of the fence to the east and who drove away in the white car.  (R.T. 7/23/15, pg. 65:5-7).  That person was the only person on the Mexican side of the fence that Gonzalez could recall with any certainty.  (R.T. 7/23/15, pg. 149:7-10).

The only other persons Gonzalez noticed on the Mexican side were the construction workers on the roof.  (R.T. 7/24/15, pg. 11:4-25).  Upon arrival at the scene and while exiting his patrol vehicle, Gonzalez broadcast through his radio his first observations.  That broadcast was played in court and is plaintiff's Exhibit 6A.

He said:

> "504, units.  We got a bail-out!  We got a bail out!  BP's.  We got two units on top of the roof."

Then DPD, Officer Rodriguez said:

> "(Inaudible) subject is trying to make it South.  He went South."

Then DPD Officer Gonzalez says:

> "Shots fired Border Patrol!  Shots fired Border Patrol!  One subject down. Can we get medics out here?"

Gonzalez testified that, as Tidwell was exiting his vehicle, two rocks hit Tidwell's vehicle.  As the "third" rock came over the roofline of the Tahoe, he saw Tidwell fire several rounds.  (R.T. 7/23/15, pg. 136:13-25).  Gonzalez testified that as Tidwell exited his vehicle his hand was on his weapon and his hand came up in an aiming position.  (R.T. 7/24/15, pg. 12:13-22).  Gonzalez's observation of the shooting and rocks occurred as he exited his patrol vehicle as the shooting was part of his broadcast.

Several rocks were picked up several hours later by Sgt. Ritchie and are in evidence.  Gonzalez did not identify specific rocks as being rocks that had been actually thrown.  He said somebody picked up a rock and showed it to him and said "could this possibly be the one" and he said "its possible." (R.T. 7/24/15, pg. 47:2-10).  Gonzalez's description during his testimony of a flat rock an inch to an inch and a half was based on the rock he saw after the incident on the border patrol vehicle wiper blade.  (R.T. 7/24/15, pg. 52:4-9).  He did not recall seeing that rock on the Tahoe while it was on the border road and only saw it after the vehicle was moved.  (R.T. 7/24/15, pg. 14:2-14).  He assumed the flat rock broke the windshield because after the vehicle was moved he saw it on the windshield. (R.T. 7/24/15, pg. 53:11-18).

21

Plaintiff's Exhibit 14, photo 39 is a screen shot from the "anonymous video" of the post shooting scene shot by a person from the U.S. side that showed Agent Tidwell getting into his vehicle one minute after the shooting and driving it to be parked to the north. That "screen shot" does not show a rock resting on the wiper blade or on the car.

Officer Gonzalez is the only witness who claims to have seen a rock hit the Tahoe. He claims the first two rocks he saw, from across the street, hit the vehicle. Tidwell, however, claimed all three went over his head and he didn't learn about a rock hitting his windshield until after he had moved his car.

The rock thrower identified by Gonzalez matched the description of the tall guy at the fence watching the shooting events who left, not limping, hurriedly when the officers approached him guns drawn. He drove away in his little white car. Having just seen a man killed as close as 15 feet away from him on the other side of the fence, his hurried departure is understandable. There was no testimony that any attempt was made to ask this eyewitness to remain or to tell them what he had seen.

**Douglas Police Officer Clemente Rodriguez**

Douglas Police officer Rodriguez was number 4 in line behind the Avalanche. (R.T. 7/23/15, pg. 98:25; 99:1). When he stopped his Chevy Tahoe he jumped out and ran to the fence (R.T. 7/23/15, pg. 99:14-17). Rodriguez noticed two people on the ladder as he approached. He saw them drop to the ground and thought they had dropped onto the Mexican side. (R.T. 7/23/15, pg. 101:8-20; 102:13-24). When he got closer he saw they were in the U.S. and not Mexico. He saw no one else on the ladder or on the fence but those two who he helped move. (R.T. 7/23/15, pg. 102:14-16; 103:1-11). Rodriguez did see one person in Mexico at the fence looking through the fence at the shooting scene. That person was "about 15 feet to the left or east of

the ladder and was only watching." (R.T. 7/23/15, pg. 105:13-24). That person, an adult male, was described as a tall guy. He was seen by Rodriguez, on his approach, to run across the street to his small hatchback vehicle and peel off. He wasn't carrying anything. (R.T. 7/23/15, pg. 102:14-21; 103:1-11).

Officer Rodriguez testified that he did not know at that time that any rocks had been thrown. (R.T. 7/23/15, pg. 106:22-24).

**Douglas Police Officer Miramontes**

DPD officer Miramontes was number two in line directly behind Officer Gonzalez. He saw two guys on the ground and a third guy leaning up against the fence on the Mexican side. (R.T. 7/23/15, pg. 47:13-21). The guy leaning up against the fence was a "tall, thin person." (R.T. 7/23/15, pg. 60:3-7). The tall, thin guy was watching, but, when the officers approached the fence with their guns drawn, he turned around and ran toward his vehicle, a small silver or white little station wagon or hatchback vehicle and sped off eastbound. (R.T. 7/23/15, pg. 47:16-21, 54:4-18, 57:13-17).

The only other persons he saw in Mexico were some construction workers on the roof of a residence. (R.T. 7/23/15, pg. 53:10-15).

Miramontes said he heard officer Gonzalez say there was one person up on the roof throwing a rock and then the other kid that was on the ladder helping one of the kids that we apprehended." (R.T. 7/23/15, pg. 50:3-13).

**Douglas Police Officer Martin Villa**

Officer Villa said he was number 3 behind the Avalanche and Sgt. Ted Kulkins was number 2. All of the police vehicles had their sirens and emergency lights on. (R.T. 7/23/15, pg. 12:17-19; 22-24; 13:2-24). Officer Villa interviewed by Cochise County Sheriff Detective John Gjerde a couple of hours after

the shooting.  (R.T. 7/23/15, pg.  20:1-5).  He said that from his vantage point he saw two people and thought they had fallen into Mexico.  (R.T. 7/23/15, pg. 22:20-23).

Villa did not mention anyone on the fence in any way.   (R.T. 7/23/15, pg. 23:2-4).  He did not report anyone reaching for LaMadrid. (R.T. 7/23/15, pg. 23:5-7).  He did not report to Felipelli any rocks being thrown or even mention rocks. (R.T. 7/23/15, pg. 23:8-13).  He did report seeing some individuals on a roof of a house under construction in Mexico.  (R.T. 7/23/15, pg.  23:14-24).

At a deposition three years later on April 23, 2014, Villa claimed to recall several individuals on top of the fence on the Mexican side yelling and making hand gestures.  (R.T. 7/23/15, pg. 25:15-24).  At his deposition he claimed to have seen a person sitting on the fence reaching for LaMadrid and that person fell down with LaMadrid into the U.S.  (R.T. 7/23/15, pg. 31:1-9).

At trial Villa remembers bodies on top of the fence but doesn't recall if they were sitting on top of it, legs in the U.S. or in the Mexican side.  (R.T. 7/23/15, pg. 28:16-19).  He did not see how those people got off the fence. (R.T. 7/23/15, pg. 29:13-15).  In responding to a question at trial asking him to explain what one of those persons was doing, Villa testified that he recalled someone standing in Mexico and leaning against the fence, and that person had a clear view of what the law enforcement persons we were doing. (R.T. 7/23/15, pg. 26:18-25).

In response to a question from the Court Officer, Villa said that there were two people on the fence on the Mexican side "directly above the ladder.  Directly south of the ladder."  (R.T. 7/23/15, pg. 33:17-25; 34:1-3).

**Fernando Juarez Chavarria**

Fernando Juarez Chavarria, age 50, was one of the construction workers at the house under construction in Agua Prieta across the street from the shooting site.  He

had gone upstairs to see what was going on after hearing the sirens of the Douglas police . (R.T. 7/21/15, pg. 103:18-23).  He testified that he did not see anyone on the Mexican side throwing rocks nor did he see any ladder on the Mexican side.  (R.T. 7/21/15, pg. 105:15-25).  Mr. Juarez watched the entire incident from when he saw two people get out of the truck and run toward the ladder at the fence.  He saw LaMadrid about a meter from the top of the ladder, heard a shot followed by three or four more shots and then saw the young man fall.  (R.T. 7/21/15, pg. 104:7-25; 105:1-3).

**Rene Galaz De La Torre**

Mr. Galaz, age 26, was also a construction worker at the house across the street.  He was having lunch when he heard the sirens and went upstairs to see what was going on.  (R.T. 7/21/15, pg. 76:13-15).  He had a clear view and saw the Border Patrol and Avalanche and police cars approaching.  (R.T. 7/21/15, pg. 76:21-24).  He saw the people in the Avalanche come out and run to a ladder leaned against the fence.  (R.T. 7/21/15, pg. 78:19-21).  At the same time he saw the border patrolman get out of his car he heard one shot that struck the metal fence so, and he crouched down.  He raised his head again and heard three more shots that hit the guy on the ladder who then fell onto the other guy.  (R.T. 7/21/15, pg. 78:3-9; 77:9-14).

Mr. Galaz testified that he never saw anyone on the Mexican side and no one threw anything.  (R.T. 7/21/15, pg. 79:7-19).  Mr Galaz went downstairs to get his cell phone camera after LaMadrid was on the ground.  (R.T. 7/21/15, pg. 79:20-25).  The break in the sequence of his video came when agent snipers on top of their patrol vehicles pointed their weapons at him when they saw he was recording, and he ducked down for his safety as he was really afraid.  (R.T. 7/21/15, pg. 82:4-21).  Mr. Galaz gave a copy of his telephone video to a sister of Mrs. Guerrero when they

1   were visiting at the shrine at the location of his shooting.  He did not know Carlos.

2   (R.T. 7/21/15, pg. 90:11-14).

3   **B.P. Agent John Jameson**

4   On March 21, 2011 Agent John Jameson was the camera operator on the tall

5   camera pole near the border fence at the Jefferson street alignment.   Camera

6   operators look for suspicious activity and broadcast it over the Border Patrol radio

7   system.  (R.T. 7/20/15, pg. 251:17-25; 152:12-22; 155:2-13).  Agent Jameson was

8   alerted to the Avalanche vehicle chase at approximately 12:03 through "Burn 1"

9   broadcast.  When he learned it was going south on Cochise he focused on that area

10  and saw the collision.  (R.T. 7/21/15, pg. 11:16-21; 12:1-11).

11  Based on his memory of the event, he did not see any person on top of the

12  fence.  Nor did he see any person hanging on the fence.  (R.T. 7/21/15, pg. 13:12-

13  22).  He did not see anyone that appeared to be throwing rocks or any objects. (R.T.

14  7/21/15, pg. 13:23-25).  Jameson recalls seeing only one person on the ladder.  (R.T.

15  7/21/15, pg. 141-8).

16  Agent Jameson's pre-trial "voluntary" work attempting to interpret the grainy

17  stored video was unconvincing to explain how he can see on a poor quality video

18  what he could not see in real time with high-powered clear images on his monitor as

19  the events occurred.  As shown in our attempt to recount his testimony in our

20  summary of testimony his testimony was unclear and at times incredible, as it failed

21  to take into account perspective.  Because of perspective the camera at Jefferson

22  could not see anyone at the fence.  Although the number of feet near the fence where

23  a person could not be seen was not established even Jameson agreed that a person

24  within 6 to 8 feet of the fence would disappear from the view.

25  A person could only be seen by that camera when he appeared above the

26

1  fence.  Jameson interpreted persons in the dirt area well south of the fence as being

2  on the fence or climbing the fence.

3  **Border Patrol Agent Lucas Tidwell**

4  According to Supervisor Border Patrol Agent Jorge Roman's memorandum,

5  he interviewed Agent Lucas Tidwell at approximately 2:35 p.m. on March 21, 2011

6  He "asked agent Tidwell the following eight questions required at all shooting

7  incidents, as per Service policy.  Included were the following questions and answers:

8        5.    Q: A brief description of the incident, including any unusual
9             circumstance(s) which might cause additional conflict(s) or confrontations?

10             A: DPD was chasing a vehicle and I moved from Rose and started heading towards Cochise and on the line and I was
11             traveling east bound and the gold Avalanche was traveling south. The subject did not brake and our vehicles made contact and the
12             subject climbed a ladder.

13  Agent Tidwell did not relate rocks being thrown as part of his description of

14  the incident.  He simply said "our vehicles made contact and the subject climbed a

15  ladder."  (Plaintiff's Exhibit 25).

16        3.    Q. The identity, physical description, and current location of any individual(s) known to be involved in, or to have witnessed the
17             incident, including suspects who are at large.

18             A. Two subjects were south of the International Border.  Two subjects were on a ladder.  One subject who was not shot was
19             skinny and one subject is shot.

20  Tidwell only mentioned "two subjects were south of the International Border"

21  and "two were on a ladder."  Presumably the two south of the International Border

22  were the two construction workers on the roof.

23        4.    Q.  The description and location of vehicles involved in the incident, including any suspect vehicles?
24
25             A.  Location was Cochise and the line and my Service Vehicle and the subjects vehicle a gold Avalanche.

26

The "white car" driven by the "tall this guy" was not considered by Tidwell to be "involved in the incident."

On December 20, 2013, Agent Tidwell made a handwritten sworn statement for the Office of Inspector General of the U.S. Department of Homeland Security. This sworn statement was made after consultation on several occasions with his Union Attorney and after discussion with agents and his attorney in Deming, New Mexico. (Plaintiff's Exhibit 27). On page 2 Agent Tidwell wrote:

> ...As the driver was climbing the ladder I observed another individual come into my view along side the suspect's vehicle passenger door and also run towards the ladder. At the same time I noticed two large rocks/boulders directly above me coming right at me. I immediately ducked using my vehicle as cover. My driver's side door was opened when I ducked. I got back up and saw the driver continue up the ladder with the passenger below him. Immediately I saw another rock come barreling towards me. Again I ducked using my vehicle as cover. The origin of the rock appeared to come from the top of the fence where the ladder was resting.

> ...I immediately changed my position to the rear of my vehicle several feet to the north of it. I was already aimed in at the top of the fence where the ladder was resting against. I remember the wind and sand hitting my face and the sun against my face. At the top of the fence I saw a bulge, silouette of person(s). It was hard to tell because of the sun. I noticed a projectile or a motion consisting of throwing a rock at me and fired 3-5 rounds from my service issued weapon.

> ...There were also people on the roofs of buildings on the south side.

> As a precaution I moved my vehicle north of the area as did others....

Among the noteworthy aspects of this careful sworn statement is the absence of seeing any actual persons on the border fence. The fence was 132.5 inches or 11.04 feet high. (Plaintiff's Exhibit 26, Sgt. Gjerde's measurements on page 2). Tidwell was 18 inches elevated on the roadway so as to him the fence was 9.4 feet high and he was around 25 feet from the fence. (Plaintiff's Exhibit 18). A more precise distance isn't known. The point, however, is that it is not plausible that Agent Tidwell could have failed to recognize a person or persons on top of an 11

1   foot fence directly in front of him.  It was 12 noon on or about the spring equinox.

2   The sun was directly over head.  Dust would not effect such a close view.

3       Agent Tidwell was behind the cover of his vehicle which had windows.  He

4   was looking directly at the area where the alleged rocks were coming from.  A

5   person on top of the fence would have been several feet higher no matter how he was

6   holding on.  The fence was transparent for persons looking directly at the fence.  Yet,

7   Agent Tidwell could only describe a "bulge, silhouette of person(s)."  People that

8   close are not bulges nor are they silhouettes nor could one be undecided whether

9   there were one or two persons were on the fence.

10  **The Shooting**

11      A.R.S. § 13-405(2) provides that a person is justified in using deadly force

12  against another only when and to the degree a reasonable person would believe that

13  deadly physical force is immediately necessary to protect himself against the other's

14  use or attempted use of unlawful deadly physical force.

15      Carlos LaMadrid did nothing more than run to a ladder he saw leaning against

16  the border fence in an attempt to escape his pursuers by getting over the fence into

17  Mexico.  He neither used or attempted to use any force of any type.

18      Officer Gonzalez saw Tidwell exiting his vehicle with his hand on his pistol

19  and his hand came up in an aiming position.  (R.T. 7/24/15, pg. 12:13-22).  He

20  testified Tidwell fired his shots as he was exiting his vehicle.  (R.T. 7/23/15, pg.

21  141:10-15).

22      Tidwell was aware of the U.S. law that it is unlawful to shoot at someone to

23  try to stop them from climbing a ladder if they think there's marijuana or narcotics

24  in the vehicle and the person is going to escape.  Tidwell testified he had the pistol

25  in his hand because "I had an individual that tried to run his vehicle into mine." (R.T.

26

7/20/15, pg. 84:1-13).  He did not say that he had his pistol in his hand because of rocks being thrown.  As for the Avalanche trying to run into the Tahoe the expert testimony from the Sierra Vista Police reconstruction witness was the opposite of Tidwell's statement.

Contrary to Tidwell's testimony, the Sierra Vista Police Department's expert accident reconstructionist Robert Randall concluded that from the physical evidence of the vehicles he closely examined, and his subsequent review of the border patrol video, it was Agent Tidwell who steered into the Avalanche.  (Plaintiff's Exhibit 19, pg. 9 and Plaintiff's Exhibit 7, Border Patrol video, Camera 7 @12:11:20).

In other words, Tidwell allegedly had his pistol in his hand as a result of something that the evidence showed didn't happen.

Tidwell was aware from "Burn 1" broadcasts that the Avalanche was trying to escape from the police because of a bundle behind believed to be marijuana in its back.  He saw both individuals from the Avalanche run for the fence.  He saw Carlos LaMadrid run in front of his vehicle toward the ladder.  (R.T. 7/20/15, pg. 81:10-23).  He saw Manuel Chino Lino near the passenger door of the Avalanche running toward the fence.  (R.T. 7/20/15, pg. 82:1-9).  Although the precise location of the two vehicles can't be determined because they were quickly moved following the shooting, nonetheless, it is clear that those persons and the ladder were in front of Tidwell and quite observable through his windshield.

The two events that Tidwell knew for certain were that (1) a bunch of Douglas Police cars were chasing the Avalanche and were only seconds away, and, were nearby and (2) that the guys in front of him would get away, if they continued up the ladder that he saw LaMadrid climbing, before the Douglas police could catch them.

Tidwell testified that he was in the process of getting out of his car, half-way

in and half-way out, when he first saw the two rocks fly by.  (R.T. 7/20/15, pg. 86:6-10).  Tidwell admitted that if he had stayed next to his door which was stout and heavy, the vehicle's A-pillar would have protected him from any mortal danger.  (R.T. 7/20/15, pg. 86:13-28).

Tidwell went on to describe the shooting:

> A.   No, sir.  When I saw–when I got up the second time, I was already aimed in at the silhouette on top of the fence where the ladder intersect.  And immediately I saw indicative, I can't be sure, but of either a throwing motion or an object coming at me.  And I discharged my weapon.
>
> Q.   And you weren't sure.  You didn't even bother to duck that time?
>
> A.   No, sir.
>
> Q.   And when you had looked up and you didn't see someone throw but saw something come from there, did you check and look and see if there were people, actual individual people you could see?
>
> A.   My only concern was the individual assaulting me on top of the fence.
>
> Q.   But you don't know that the person you fired at was at was the person that threw the two rocks or boulders at you, correct?
>
> A.   Correct.

Tidwell's rendition of the shooting events are not clear but it is clear that he left a position of cover and safety to fire and that he fired without identifying a clear target.  His best story is that he did not know that the person he fired at was the person who had thrown rocks at him.

It is unreasonable to conclude that an excellent shot such as Agent Tidwell, who had been tested for his pistol proficiency for 48-50 times with high scores, would have hit a person directly in front of him and no more than 2 or 3 feet higher

31

than his pistol stance when he was aiming at a "silhouette" or "bulge" on top of the fence itself, several feet higher.  (R.T. 7/20/15, pg. 49).

The shooting was intentional.  Not one of the four shots taken at Mr. LaMadrid missed.  Only one shot grazed his shoulder and the rest were found in his body at the time of the autopsy.  The shooting was grossly negligent at best.  The most reasonable conclusion is that Agent Tidwell got carried away by the apparent escape.  The subsequent actions of the officers on scene are only explainable by their desire to help a fellow officer who had gotten carried away by the moment.

This Court should find that this shooting was not justified pursuant to A.R.S. § 13-405.

**B.   Negligence Claim**

The Defendant indicated in its Opening Statement its belief that Garcia v. United States, 826 F2d 806 (9th Cir. 1987) stands for the proposition that the Government can not be held liable based upon Officer Tidwell's negligence. Plaintiffs respectfully submit that this position is not supported by the *Garcia* case. In its analysis, the court noted that under the FTCA the government both shall be liable... "in the same manner and to the same extent as a private individual under right circumstances..." 28 U.S.C. § 2674.   Liability is to be determined 'in accordance with the law of the place where the [wrongful] act or omission occurred.' 28 U.S.C. § 1346." pg. 809.

In Walker v. McClanahan, 16 Ariz. App. 526, 494 P2d 725 (1972), the court found in a case involving an accidental shooting, that the doctrine of *res ipsa loquitur* was applicable to create an inference of negligence which could be accepted or rejected by the jury.  This finding necessarily includes the finding that individuals can be found liable for negligently handling a firearm.

In <u>Garcia v. Puchi</u>, 24 Ariz. App. 210, 537 P2d 47 (App. 1975) the Court found there was sufficient evidence of contributory negligence on the part of the plaintiff who positioned himself where he would be negligently shot by another hunter.  In so holding, the court cited <u>Edgar v. Brandvold</u>, 515 P2d 991 (1973), for the proposition that in a hunting accident situation, the degree of care required of both the defendants and the plaintiff was the care a reasonably prudent person would exercise under the circumstances and commensurate with the risks involved.  See also the other case cited in <u>Garcia v. Puchi</u>, at pg. 49-50, all involving negligence cases involving the use of firearms.

In addition see A.R.S. § 13-1102, Manslaughter, and A.R.S. § 13-1102, Negligent Homicide, both of which allow a finding of criminal liability for misuse of weapons which result in the death of another where the defendant acted either recklessly or with criminal negligence.

A.R.S. § 13-105(10)(c) defines "recklessly" as meaning "with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.  The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

"Criminal negligence" is defined as being "with respect to a result or to a circumstance described by a statute defining an offense, that a person fails to perceive a substantial and unjustified risk that the result will occur or that the circumstance exists.  The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."  See A.R.S. § 13-105(10(d).  In <u>State v.</u>

1    Valenzuela, 194Ariz. 404, 984 P2d(1999), the Court found that where a defendant
2    intends to shoot one person but shoots and kills a second person who stepped in front
3    of the intended victim, the defendant can be guilty of reckless manslaughter.

4        Arizona law recognizes negligence *per se* where there is a breach of a statute
5    intended as a safety regulation.  See Brannigan v. Raybuck, 136 Ariz. 513, 667 P2d
6    213 (1983).  Hutto v. Francisco, 210 Ariz. 88, 107 P3d 934 (App. 2005).  Griffith
7    v. Valley of Sun Recovery and Adjustment Bureau, Inc., 126, Ariz. 227, 229, 613
8    P2d 1283, 1285 (App. 1980).  Orlando v. Northcutt, 103 Ariz. 298, 300, 441 P2d 58,
9    60 (1968) and Alaface v. National Inv. Co.,  181 Ariz. 586, 892 P2d 1375 (App.
10   1994). ("a person who violates a statute enacted for the protection and safety of the
11   public is guilty of negligence *per se.").*  Clearly A.R.S. § 13-1102 and 13-1103, are
12   statutes to which the doctrine of negligence *per se* is applicable.

13       Both case law and criminal statutes recognize a cause of action for negligently
14   shooting and killing someone.  Garcia v. United States  simply holds that an agents
15   negligence in getting into a situation when it is necessary to utilize deadly force to
16   protect himself does not mean he cannot protect himself where justified.  Here, the
17   government claims Agent Tidwell, was justified in using deadly force against the
18   phantom rock-thrower.  Assuming he was justified in doing so, the defendant can
19   still be held liable if he negligently did so by shooting without identifying a target
20   and knowing that Mr. Lamadrid and Mr. Chino Lino were present in the same area.

21       Arizona law clearly recognizes a claim for negligence based on the handling
22   of firearms.

23       In Garcia, the court considered a Federal Tort Claims Act arising out of a
24   border patrol agent shooting a Mexican National who was part of a group threatening
25   to kill the agent. The facts leading up to the shooting in Garcia are important in

26                                           34

1    understanding the language the government relies upon in this case.

2          In Garcia, the Mexican citizens, including the plaintiff, gathered on one side

3    of the Colorado river for purposes of crossing without inspection into the United

4    States. In addition, two fisherman parked their truck at a dam for purposes of fishing.

5    The agent observed a teenage boy suspiciously near the fisherman's truck. The

6    officer tried to stop the teenager to question him.  However, the teenager fled on foot

7    towards Mexico.  The Officer, drove his vehicle to the west in order to prevent the

8    teenager from returning to Mexico.  When confronted, the teenager violently resisted

9    the officer's attempt to detain him and was able to break away on several occasions

10   only to be recaptured. Ten to twenty minutes before the plaintiff was shot, the officer

11   drew his revolver and fired a warning shot in an attempt to stop the teenager.

12   Ultimately he was able to throw him to the ground and hold him while he was

13   handcuffing him. However, the warning shot drew the attention of witnesses,

14   including the group of Mexicans who had crossed into the United States.  This group

15   became extremely agitated in the belief that the officer had crossed into Mexico to

16   capture the teenager.  The officer refused their demand that he release the teenager

17   and warned the Mexicans that they were in the United States.  However, the

18   Mexicans continued to demand the teenager's release and threatened to kill the

19   agent.  The agent was able to get the teenager into his marked vehicle with the help

20   of one of the fishermen.  The Mexicans continued to approach the officer armed with

21   rocks and sticks, demanding the teenager's release.  It was as they came within a few

22   feet of the officer that the officer shot the plaintiff.  Id. at pg. 807-8.

23         The trial court found that the officer was wantonly negligent (1) in the manner

24   in which he attempted to detain the teenager (2) in firing a warning shot at or near

25   the teenager, (3) in the treatment of the teenager during and following detention; (4)

26
                                            35

by failing to release the teenager, who at best had committed a minor misdemeanor offense (5) by failing to follow Border Patrol Manual guidelines with the respect to youths; and (6) by creating a dangerous situation which was likely to result in serious injury or death to the agent, or some another innocent person. Id. at pg. 808. None of the alleged negligence related to the officer's firing of the weapon at the Plaintiff.

The Ninth Circuit indicated that it had grave doubts concerning the trial courts findings and conclusions regarding negligence, however, the Ninth Circuit did not decide whether the plaintiff established a *prima facie* case of negligence because the Court needed to address the issue of self-defense regarding plaintiffs  assault and battery claims.  Id. at pg. 809-810.

The Court noted that A.R.S. § 13-413 provides that "no person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter."  The Court stated that "under this provision, the United States may not be held liable if [the officer] was justified in shooting [the plaintiff], even if [the officer] was negligent and his negligence proximately caused [the plaintiffs] injury."  Id. at pg. 810.  It is apparently this language that the defendant here interprets to mean that it cannot be held liable if Agent Tidwell negligently shot Carlos.  However, the Garcia court does not hold that a person who is justified in shooting one person, can not be liable for negligently shooting another person.

The Court discussed the provisions of A.R.S. § 13-404 and 13-405, finding that "A.R.S. § 13-405 provides that threat or use of deadly force is justified where physical force is justified under § 13-404 and 'when a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force.'" Id. at pg 810.

36

1   (Emphasis added).

2       The Court stated that the use of deadly force against the Plaintiff was justified

3   unless the officer (1) used or attempted to use unlawful deadly force to arrest the

4   teenager; or (2) provoked the plaintiff's assault.  The Court then found that the

5   District Court's finding that the officer created a dangerous situation which was

6   likely to result in serious injury or death to the boy was essentially a finding that the

7   officer threatened the teenager with death or serious bodily injury.

8       The Court found that this finding was clearly erroneous for four reasons.

9   First, the legality of the arrest was not relevant to whether the shooting was justified

10  since Arizona law does not permit suspects (or others) to use force to resist illegal

11  arrests and the Fourth Amendment already prohibits use of deadly force to apprehend

12  non-dangerous suspects even in legal arrests.

13      Second, since the question of whether the officer forfeited his right of self

14  defense does not depend on whether the plaintiff or the teenager were legally

15  justified in using deadly force against the officer since Arizona law only permits a

16  person to use deadly force to resist an arrest effected with excessive force if "under

17  the circumstances as a reasonable person would believe them to be, deadly force is

18  immediately necessary to protect the suspect against the use or attempted use of

19  unlawful deadly force." As a result, the court found that the officer did not forfeit his

20  right to self-defense even if the plaintiff reasonably, but mistakenly, believed that the

21  teenager was in danger of death or serious injury.  Only if the officer actually used

22  or attempted to use deadly force against the teenager did the officer forfeit his right

23  to defend himself against a deadly attack.

24      Third, the court found that it did not need to consider whether the officer used

25  excessive non-deadly force to arrest the teenager since the use of excessive non-

26

deadly force does not vitiate an officer's right to defend against a deadly attack.

Finally, the Court found that it did not need to consider whether the officer would have been justified in using deadly force to arrest the teenager because he did not use such force to arrest the teenager. Id. at pg. 810.

The Court found that the agents firing of a warning shot 10-20 minutes before plaintiff was shot did not justify the plaintiff in threatening or using deadly physical force against the officer since by the time of the shooting, the teenager was no longer in danger of injury at all, let alone death or serious bodily injury. Id. at pg 811.

The Ninth Circuit further found that the officer did not provoke the use of force such as "that the officers right to assert self-defense was forfieted." In this regard, the Court found that unintentional acts can not constitute provocation even if the officer was "wantonly negligent" in a variety of respects. The Court of Appeals rejected the District Court's finding that the officer's negligent conduct provoked the plaintiff since negligence, wanton or otherwise, does not, as a matter of law, constitute provocation under Arizona self defense statutes. As a result, the Court found that the District Court erred in holding that the officer's negligence abrogated his right to defend himself. Id at pg. 813.

To the extent that the Defendant relies upon A.R.S. § 13-413, its analysis is faulty. As set forth above, A.R.S. § 13-405 states that a person is justified in threatening or using deadly force against another: (1) if such person would be justified in threatening or using physical force against the other under section 13-404, and (2) when and to the degree a reasonable person would believe the deadly physical force is immediately necessary to protect himself against the others use or attempted use of unlawful deadly physical force." However, in the case at bar, there is no dispute that Officer Tidwell was not justified in threatening or using physical

1   force against Carlos LaMadrid.  There is certainly no evidence to support a finding

2   that a reasonable person would believe that deadly physical force was immediately

3   necessary to protect Agent Tidwell against Carlos LaMadrid's use or attempted use

4   of unlawful deadly physical force, as he was running away from Agent Tidwell and

5   climbing a ladder.

6        To the extent that the government relies upon the <u>Garcia</u> court finding that the

7   Officer's negligence in <u>Garcia</u>, abrogated his right to defend himself, there is no

8   claim in this case that Officer Tidwell's negligence abrogated his right to defend

9   himself.   Rather, in the case at bar, the claim that Officer Tidwell was negligent is

10   based upon his having fired his weapon without having identified a target and

11   knowingly shooting into an area he knew was occupied by Carlos LaMadrid and

12   Jesus Manuel Chino Lino,  two individuals, who were admittingly not utilizing

13   deadly force against him.

14   **C.**    **Damages**

15        A.R.S. 12-613 provides the measure of damages in a wrongful death case.

16   The statute reads in part s follows:

17 
18 
19 
> In an action for wrongful death, the jury shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, negligent or default. ...

20        In <u>Boies v. Cole</u>, 99 Ariz. 198, 407 P.2nd 217 (1965) the Arizona Supreme

21   Court interpreted the 1956 changes to our wrongful death statute.   Those

22   amendments followed <u>Downs v. Sulfur Springs Valley Electric Coop</u>, 80 Ariz. 286,

23   297 P.2d 339 (1956) where our Supreme Court held that the predecessor statute did

24   not provide for punitive damages.  The <u>Boies v. Cole</u> court held "that the use of the

25   words 'aggravating circumstances' as applied to the wrongful death act is a clear

26

implication of legislative intent to allow punitive damages in wrongful death actions." Supra. P. 204.

The <u>Boies</u> Court "read the wrongful death statutes §§ 12-611 and 12-613, as being in two parts. First, damages shall be those that are "fair and just." Id. at 203. The current Revised Arizona Jury Instructions (Civil) 4th, (RAJI), No. 3) states the compensable elements relevant to the claims in this case for loss of a child.

> If you find [defendant] liable to [plaintiff], you must then decide the full amount of money that will reasonably and fairly compensate [name of each survivor][separately] for each of the following elements of damages proved by the evidence to have resulted from the death of [name of decedent].
>
> 1.    the loss of love, affection, companionship, care, protection, and guidance since the death and in the future.
>
> 2.    The pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced, and reasonably probable to be experienced in the future.

The <u>Boies v. Cole</u>, court analyzed the "second" part of damages in the statute with "regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default." A.R.S. § 12-613. The Court concluded as follows:

> The phrase "mitigating or aggravating circumstances attending the wrongful act ***" would have to be an element of damages created by the legislature in addition to those considered to be "fair and just". The word "aggravating" modifies the words "wrongful act***" and is a clear implication that the element of damages added by the amendment are punitive damages. Id. at pg. 204.

The Arizona Supreme court in <u>Welch v. McClure</u>, 123 Ariz. 161, 163, 598 P.2nd 980, 982 (1979) clarified that the wrongful death statute did not authorize a separate punitive damages line item. There should be one award for each plaintiff but that award should include the aggravating circumstances element.

Arizona courts have recognized "the primary purpose of punitive damages to

express society's disapproval of intolerable conduct and to deter such conduct when no other remedy would suffice." Haralson v. Fisher Surveying, Inc. 201 Ariz. 1,4, 31 P.3d 114,117 (2001). Punishment, societal condemnation, deterrence, and public policy have been recognized in Arizona as valid grounds for assessing punitive damages. See, e.g. Wyatt v. Wehmueller, 167 Ariz. 281, 285, 806 P.2d 870, 874 (1991) (stating that such awards "punish reprehensible conduct"); Acheson v. Shafter, 107 Ariz. 576, 578, 490 P.2d 832, 834(1971) (declaring that "punitive damages are allowed on grounds of public policy"). Haralson supra. p. 3.

Agent Tidwell testified that he was well aware that it is unlawful to shoot a fleeing person. The evidence fairly infers that he probably shot Carlos LaMadrid to prevent him from getting over the fence. That is certainly an aggravating circumstance. The immediate destruction of the crime scene was an aggravating circumstance as it has resulted in delaying justice and truth for more than four years since Carlos LaMadrid's death.

The delay in affording medical care to Carlos is an aggravating circumstance. The eye witness construction workers were yelling at the border patrolman in the U.S. because of their treatment of Carlos after he was shot. Rene Galaz De LaTorre said they yelled,""to leave him alone, to leave him there. They had already killed him." (R.T. 7/21/15, pg. 80:3-6). The Douglas clinic had Carlos arriving at the hospital in Douglas 1 ½ hours after he was shot. (Plaintiff's Exhibit 2).

The plaintiffs were frantic and anguished because of those delays.

The parents damages result from two sources. One source is their profound grief from the injustice of Carlos death. From the very first they have sought to find out what happened and why. This Court heard the emotional recorded telephone call of Janet Guerrero, to Sgt. Ritchie purporting to be Guadalupe who does not speak

English well enough to call herself.   Her sister's emotional tone reflected Guadalupe's emotions as well.  Guadalupe even visited Jesus Manuel Chino Lino at the jail to find out what happened to her son.  She testified to trips to Washington D.C. to find out what had happened to her son.

The loss of Carlos has been devastating to the plaintiffs.  Carlos was the pride of their family.  He carried the name of Carlos LaMadrid as the eldest son.  He was a gifted musician and athlete.  He was the always happy party guy who urged or organized or starred in their family parties and gatherings.

Carlos loved to play soccer just as his father loved the sport.  Carlos LaMadrid taught his son auto mechanics and worked with him on auto sales.  The son Carlos was delaying his wedding because he wanted his father to attend the ceremony.

Carlos and Guadalupe were "best friends."  He was the light of their lives.  All their family events have been poorer or non existent because of his absence.

The marriage relationship was almost destroyed resulting from Carlos death.  Mr. LaMadrid, the plaintiff, has attempted suicide twice due to his dispondence and depression.  He formerly was only a social drinker but since his death has dealt with his depression through alcohol.

All the family has suffered in ways that demonstrates the crushing blow to the parents.  Martha LaMadrid, Carlos sister, testified about her own attempted suicide and her little brothers severe emotional problems resulting from Carlos death.

Before his death the plaintiffs were expecting to become grandparents from Nydia's pregnancy and were hopeful that Carlos' criminal problem from the transportation of an undocumented person was behind him.  Even if he had been prosecuted for the marijuana bundle in his car it would not have likely resulted in a long sentence.

1       The plaintiffs horrendous losses are permanent and devastating.  Plaintiffs life
2   expectancy table, Plaintiffs' Exhibit 9, shows a life expectancy for Guadalupe of
3   41.3 years and 38.5 years for Jesus LaMadrid Sr.

4       The amount of damages is the decision of the court alone.  Plaintiffs suggest
5   that it should be several million dollars to accomplish the duel goal of providing full
6   compensation and to get the appropriate attention of the border patrol.  The facts of
7   this case reveal very serious problems in the manner in which the border patrol
8   handles fatal shootings.   In this unique event that occurred on one of the most
9   intensively monitored portions of the border with high ranking commanders on the
10  scene lawful procedures were not followed and the protection of the public became
11  solely protection for the shooter.  One can only imagine what happens in areas away
12  from cameras and multiple eye witnesses.  One of the central purposes of tort law
13  and specifically of Arizona's wrongful death law is to deter similar conduct in the
14  future.  The public interest requires full justice for the parents.

16  Respectfully submitted, this 26th day of October, 2015.

17                                  **JESUS   ROMO   VEJAR,   P.C.**
18                                  **RISNER & GRAHAM**

19
20                                  ***/s/ William J. Risner***
                                _____
21                                  William J. Risner
                                *Attorneys for Plaintiffs*

1

2                    **CERTIFICATE OF SERVICE**

3      This is to certify that on October 26, 2015 a true and correct copy of Plaintiffs'
       Post Trial Memorandum was served by U.S. Mail and Electronic Mail on the
4      counsel of record for all parties to the action below in this matter as follows:

5                    **DAVID B. WALLACE,** Assistant U.S. Attorney
                     **SAMUEL BETTWY**, Assistant U.S. Attorney
6                    Office of the U.S. Attorney
                     880 Front Street, Room 6293
7                    San Diego, CA 92101-8893
              **UNITED STATES ATTORNEY - DISTRICT OF CALIFORNIA**
8                    *Attorney for Defendant*

9

10     DATED this 26th day of October, 2015.

                                        **RISNER & GRAHAM**

11

12                                      */s/ William J. Risner*
                            By:_____
13                                      William J. Risner

14

15

16

17

18

19

20

21

22

23

24

25

26
                                        44