**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Guadalupe Guerrero,

Plaintiff,

v.

United States of America,

Defendant.

No. CV-12-00370-TUC-JAS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## THE BENCH TRIAL, EVIDENCE, AND POST-TRIAL FILINGS

The Court presided over a bench trial in this case over the course of seven days. At the conclusion of the trial, the Court allowed the parties to submit post-trial briefs and proposed findings of fact and conclusions of law. The parties were also permitted to file responsive briefs addressing the opposing party's post-trial filings. In addition to seeing, hearing, and considering all of the live testimony from numerous witnesses and the many documents, pictures, and videos presented during trial, the Court has also reviewed the parties' post-trial filings, the trial transcripts, and pertinent authority.

## CREDIBILITY OF THE MOST CRITICAL WITNESSES AS TO LIABILITY

As to liability, the evidence the Court found most critical to the ultimate findings in this case was testimony from four witnesses who testified that they were eyewitnesses to the actual shooting that occurred. These four witnesses include: (1) Marcus Gonzalez ("Gonzalez"), (2) Lucas Tidwell ("Tidwell"), (3) Rene Galaz de la Torre ("Galaz de la Torre"), and (4) Fernando Juarez Chavarria ("Juarez Chavarria"). In assessing their

credibility and the truthfulness of their testimony at trial, the Court's consideration of their testimony included: the opportunity and ability to see or hear or know the things testified to, the clarity of their memories, the manner while testifying, any interest in the outcome of the case, any bias or prejudice, whether other evidence contradicted their testimony, the reasonableness of the testimony in light of all the evidence, and any other factors that impacted their believability.[1] The Court found Gonzalez to be the most credible witness as to evaluating the issue of liability and gave great weight to his testimony at trial. The Court discusses the surrounding events leading to the shooting and the actual shooting largely in conjunction with Gonzalez's testimony which covered many of the most pertinent facts. Tidwell's testimony, which was generally consistent with Gonzalez's testimony, was also credible. The testimony of Galaz de la Torre and Juarez Chavarria, which was largely inconsistent with Gonzalez's testimony, was not credible.

**FACTS SURROUNDING THE SHOOTING**[2]

Initially, the Court notes that Gonzalez has been employed either as a patrolman or detective with the Douglas, Arizona Police Department ("DPD") for the last 15 years. Tidwell, who was involved in the actual shooting in this case, has been employed by the United States ("Defendant") as a Border Patrol Agent for the last 15 years.[3] There was no evidence presented at trial reflecting that Gonzalez had any relationship or connection with Tidwell or Defendant that would impact the truthfulness of his testimony.[4] Rather,

---

[1] *See generally* Ninth Circuit Model Civil Jury Instruction 1.11.

[2] As noted above, the vast majority of the facts discussed in this section are primarily based on Gonzalez's testimony at trial. However, some facts may have been drawn from other testimony and evidence at trial where it was not covered by Gonzalez's testimony and it was warranted to state a more complete or chronological narrative of the circumstances in this case.

[3] At the time of the incident in this case, Tidwell had been a Border Patrol Agent in Douglas for 11 years.

[4] The Court only notes that Gonzalez stated that as a detective with the DPD, he has been assigned to a special joint task force with the Homeland Security Investigations task force that investigates child pornography, narcotics trafficking, human smuggling, and money laundering.

Gonzalez just happened to be a patrolman on duty who was swept up into the tragic events that occurred around noon on March 21, 2011. Near that time, the DPD received a call from a resident in Douglas stating that he saw bundles of drugs being loaded into a Gold Chevy Avalanche ("Avalanche") that was parked near his house. This information was relayed to DPD officers on duty to be alert for a vehicle matching that description driving through the streets of Douglas.

After receiving this alert, DPD officers spotted an Avalanche and numerous patrol units responded and began pursuing the vehicle. Gonzalez's vehicle was the unit that was directly behind the Avalanche and was the lead unit throughout the pursuit. Plaintiff's son, Carlos LaMadrid ("LaMadrid"), was driving the Avalanche that was loaded with 48.5 pounds of marijuana. Gonzalez turned on his lights and sirens to signal LaMadrid to pull over. However, instead of pulling over, LaMadrid increased his rate of speed in an attempt to flee and led Gonzalez and several other pursuing DPD officers on a high-speed chase through the streets of Douglas. At certain points in the pursuit, speeds reached 65 to 70 miles per hour on longer stretches of road throughout Douglas. Gonzalez was 10 to 15 feet behind the Avalanche during most of the chase, but had to slow his speed and pull back his pursuit on at least one occasion as the chase was passing through a school zone (around noon) near an elementary school that was in session.

It became apparent to the DPD officers in pursuit that LaMadrid was likely making his way to the International Border Fence ("Fence") between Douglas, Arizona and Agua Prieta, Sonora, Mexico to flee into Mexico. As such, the DPD radioed to Border Patrol in the area to alert them to the chase of the Avalanche, and that it may be headed toward the Fence. In the midst of the chase, two calls occurred on LaMadrid's cell phone (i.e., "Henry" for 6 seconds, and "Tat" for 14 seconds).[5] Tidwell, who was

---

[5] Based on the testimony at trial, it is unclear whether these were outgoing or incoming. However, the Court notes that after these calls (as discussed in more detail later in this Order), LaMadrid fled to a specific portion of the Fence where a ladder was awaiting him on the Douglas side to climb to the Mexico side of the Fence to evade the officers. In addition, there were two people at the top of the Fence on the Mexico side who were attempting to aid his escape. One was reaching over and down to the Douglas side of the Fence to help pull LaMadrid over the Fence to Mexico, and the other was

parked in his Border Patrol vehicle near the Fence, heard the alert and began slow-rolling his vehicle (at approximately 3 to 5 miles per hour) to an area near the Fence where he thought the chase may eventually be leading so he could assist the DPD. As he began slow-rolling, Tidwell saw LaMadrid's Avalanche come into view, traveling at a high rate of speed, and it made an abrupt turn heading directly towards Tidwell's vehicle. Tidwell was taken aback by the abrupt turn and the Avalanche heading directly towards him. In less than two seconds, the Avalanche was upon him, and the front corners of the vehicles collided. Immediately after the collision,[6] LaMadrid and another male[7] jumped out of the Avalanche and ran towards a nearby ladder propped against the Douglas, Arizona side of the Fence in an attempt to scale the Fence into Mexico.

As Gonzalez stated during his testimony at trial, there were two people on top of the Fence (on the Mexico side) who were attempting to aid LaMadrid's escape into

---

hurling rocks at full force at an officer attempting to pursue LaMadrid in order to prevent LaMadrid's capture. The Court finds that the only logical conclusion to be drawn from the series of events that transpired was that LaMadrid was in contact with these associates to help aid his escape into Mexico under circumstances that could cause death to others such as the officers in pursuit. *See generally* Ninth Circuit Civil Model Jury Instruction 1.9 ("Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.").

[6] Tidwell's vehicle was approximately 15 feet from the Fence.

[7] Authorities later learned that the other male that jumped out of the Avalanche was Jesus Manuel Chino Lino ("Chino Lino"). He apparently had been ducking down during the chase as DPD officers had not seen him prior to jumping out of the car. Chino Lino is a Mexican citizen and was not available for trial despite attempts to secure his presence. The Court notes that Chino Lino made unsworn statements immediately after the shooting, and then made another set of unsworn and conflicting statements at a later time. The Government made a motion to have these statements admitted during trial. Plaintiff opposed the admission of these statements. It is undisputed that Chino Lino's statements are hearsay, they do not fit within any of the generally accepted hearsay exceptions, and therefore the Government moved to admit these statements under the "catch-all" residual hearsay exception. However, in light of Chino Lino's contradictory statements and the circumstances surrounding those statements, the Court finds those statements to be extremely untrustworthy, and denies Defendant's motion to admit Chino Lino's statements.

Mexico.[8] LaMadrid was the first to reach and start ascending the ladder. One of the individuals at the top of the Fence was reaching over the Mexico side of the Fence to the Douglas side of the Fence to help LaMadrid into Mexico. The other individual at the top of the Fence began hurling rocks at Tidwell. Two of the rocks were approximately the size of softballs, and another was the size of a brick. The individual throwing these rocks was throwing these at full force and they proceeded at a downward angle towards Tidwell at approximately 50 to 60 miles per hour.[9] There was only a split second between the throwing of rocks that were heading towards Tidwell. Immediately after the collision, and simultaneous with these rapidly evolving circumstances, Tidwell was in the process of drawing his handgun and getting out of his vehicle. As one of the rocks slammed against his windshield, Tidwell simultaneously fired one shot through the windshield as he was in the process of exiting and drawing his gun. This shot did not strike anyone. As he was standing up and out of the vehicle, another rock sailed directly towards Tidwell's head. Tidwell ducked to avoid getting hit, and then sprung back up. In the midst of these circumstances, Tidwell felt that his position was compromised. He did not feel safe where he was as he was uncertain how many people were involved in this escape given the recent appearance of the ladder, rocks sailing at him, and hearing many voices in Spanish that he did not understand. As he was standing up and stepping back from his vehicle, another rock flew towards his head and narrowly missed it by 12 to 24 inches. Simultaneous with this rock sailing at his head, Tidwell fired several shots at the person throwing rocks directly at him from the top of the Fence. At the same moment in time, however, LaMadrid had just ascended into the same area where the rock thrower was located near the top of the ladder and Fence such that LaMadrid climbed into the line of

---

[8] The Fence is approximately 10 feet tall, and there is a portion of fencing at the top that extends approximately two feet into the air towards the Douglas, Arizona side of the Fence at a 45-degree angle.

[9] Tidwell was positioned approximately 15 feet from the Fence. The rocks were sailing at Tidwell from close range and coming at him from a downward angle from the top of the Fence. Gonzalez, who was a pitcher in baseball from Little League through the end of High School, testified that he saw the rocks being thrown and believed the velocity of the rocks to be between 50 to 60 miles per hour.

shots simultaneously being fired by Tidwell at the rock thrower. As LaMadrid climbed into the direct line of fire from Tidwell to the rock thrower, he was struck by some of the bullets aimed at and intended to stop the deadly actions of the rock thrower. Upon being struck, LaMadrid fell from the ladder.[10] His associates on top of the Fence then jumped off the Fence onto the Mexico side, hopped into a vehicle, and quickly sped away from the scene. LaMadrid later died from the wounds he received.

**<u>Plaintiff's Conspiracy Theory and the Lack of Credibility of Galaz de la Torre and Juarez Chavarria</u>**

Plaintiff spent a substantial amount of time at trial trying to advance a conspiracy theory whereby Defendant, the DPD, and the Cochise County Sheriff's Department ("CCSD") all conspired together to cover up evidence that Tidwell either intentionally shot LaMadrid, or otherwise engaged in other illicit actions. All of these entities were involved in the investigation of the shooting in this case. This theory was unsupported, unconvincing, and not consistent with the evidence.

Plaintiff, for example, made much of the fact that certain evidence after the shooting was disturbed or not properly preserved. Defendant has cameras that record activity along the Fence, and there were videos covering the scene at issue in this case that were presented at trial. However, those videos are of extremely poor quality, and images can not be deciphered from those videos to either support Defendant's or Plaintiff's position. As such, the Court has not considered those videos as part of the decision in this case. Plaintiff argued that the poor quality of those videos are a reflection of intentional actions by Defendant to conceal evidence. Plaintiff presented no plausible evidence to support this position. Rather, it appears uncontested that it was very windy and very dusty at the time in question. This worked to severely obscure the view from the cameras to the area of the Fence at issue in this case. In addition, Tidwell's vehicle,

---

[10] As referenced earlier, Chino Lino was also in the Avalanche. He was ascending the ladder behind LaMadrid when LaMadrid was struck by the bullets. When LaMadrid fell, Chino Lino also fell off the ladder, and was then apprehended by authorities. Chino Lino was not struck by any bullets.

the Avalanche, and the ladder were moved shortly after the shooting, but before crime scene investigators arrived. Plaintiff argued that this impeded accurate measurements and assessment of the scene, and further shows the conspiracy by Defendant, the DPD, and Cochise County to conceal evidence. While the scene certainly could have been better preserved, Plaintiff again presented no plausible evidence to support the conspiracy to intentionally conceal evidence. Rather, the Avalanche and Tidwell's vehicle were moved further away from the Fence because law enforcement officers believed that the scene was unsafe and unsecure as the vehicles were very close to the Fence[11] where the attempted escape and rocking of law enforcement occurred.[12] In addition, the ladder was moved as there were high winds and there were concerns of it falling and injuring individuals gathering in the area.

As to the two witnesses that Plaintiff presented who were allegedly eyewitnesses (Galaz de la Torre and Juarez Chavarria) to the shooting, the Court did not find them credible. Both Galaz de la Torre and Juarez Chavarria testified that they are citizens of Mexico and were working at a construction site on the Mexico side, 40 to 50 meters from the Fence. They testified that they had an unobstructed view of the scene of the shooting. Directly contrary to the testimony of Gonzalez and Tidwell, Galaz de la Torre and Juarez Chavarria both testified that they never saw anyone at the top of the Fence near the time of the shooting and therefore never saw anyone throwing rocks at Tidwell when Tidwell fired shots that hit LaMadrid. On cross-examination, however, both Galaz de la Torre and Juarez Chavarria grudgingly admitted that they had illegally entered the United States on numerous occasions, had been apprehended by Border Patrol, and were sent back to Mexico after their apprehension. Galaz de la Torre admitted that he had been apprehended and sent back to Mexico on at least seven separate occasions. Juarez Chavarria admitted that he was stopped by Border Patrol on an occasion where he was

---

[11] The vehicles were approximately 15 feet from the Fence.

[12] A DPD Officer (Ray Miramontes) moved the Avalanche and Tidwell moved his vehicle.

driving a truck containing illegal aliens, and that on another occasion he was charged with misrepresentation in attempting to enter the United States and was deported back to Mexico. Both witnesses reluctantly admitted to these negative encounters with Defendant's immigration authorities. These witnesses appeared biased against Defendant, and their testimony was directly contradicted by the testimony discussed above. The Court did not find these witnesses to be credible. Likewise, the Court did not find the remaining evidence presented by Plaintiff as to liability to be credible or persuasive in supporting her position in this case.

**Liability, the Federal Tort Claims Act ("FTCA"), and Justification in Arizona**

As a sovereign, the United States "is immune from suit unless it has expressly waived such immunity and consented to be sued." *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007).[10] A waiver of sovereign immunity must be unequivocally expressed, and "[w]here a suit has not been consented to by the United States, dismissal of the action is required . . . [because] the existence of such consent is a prerequisite for jurisdiction." *Id.* "The Supreme Court has frequently held . . . that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign." *Id.*

The FTCA waives sovereign immunity "for torts committed by federal employees acting within the scope of their employment." *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). The FTCA waives sovereign immunity for torts committed by "the federal government for the negligence of its employees under circumstances in which the United States, if it were a private party, would be liable under the law of the place where the tortious act or omission occurred." *Whisnant v. United States*, 400 F.3d 1177, 1180 (9th Cir. 2005). Constitutional tort claims are not actionable under the FTCA because law of the place means law of the State, not federal law. *See Jachetta v. United States*, 653 F.3d 898, 904 (9th Cir. 2011). Generally, the FTCA does not waive sovereign

[10]Unless otherwise noted by the Court, internal quotes and citations have been omitted when citing and quoting case law throughout this Order.

immunity for intentional tort claims, but an exception exists, waiving sovereign immunity, where intentional torts are committed by investigative or law enforcement officers acting within the scope of their employment. *See* 28 U.S.C. § 2680(h). The law enforcement exception provides liability for certain torts, including "false arrest, assault and battery, and intentional infliction of emotional distress[[11]] . . . to the same extent as a private individual under like circumstances." *Tekle v. United States*, 511 F.3d at 851-54 (9th Cir. 2007); *see also Garcia v. United States*, 826 F.2d 806, 809 (9th Cir. 1986) (although law enforcement officers exercise discretion in their duties, those choices typically "do not involve the sort of generalized social, economic and political choices that Congress intended to exempt from tort liability.").

As referenced above, as the shooting took place in Arizona, the Court applies Arizona law. *See* 28 U.S.C. § 1346(b)(1). Plaintiff's Second Amended Complaint ("SAC") specifically lists only one-count (i.e., "Count One-Negligence"), but states that Tidwell's actions were "reckless, intentional, excessive, unwarranted, grossly negligent and fell below any reasonable standard of care" such that the Government is liable for the wrongful death of LaMadrid. *See* Doc. 50 (SAC at p. 4). The dispositive issue in this case as to civil liability, however, is whether Tidwell was justified in his use of force pursuant to the statutory mandates of Arizona's justification statutes. *See* A.R.S. § 13-401, *et seq*.

As pertinent to this case, A.R.S. § 13-413 states: "No person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." A person, including a law enforcement officer, is justified in using deadly force if: (a) a reasonable person would believe that physical force is immediately necessary to protect himself from another's use of unlawful physical force, and (b) a reasonable person would believe that deadly physical force is immediately

---

[11] *See* 28 U.S.C. § 2680(h). The law enforcement exception has also been held to reach emotional distress claims resulting from a false arrest motivated by malice. *See Gasho v. United States*, 39 F.3d 1420, 1434 (9th Cir. 1994).

necessary to protect himself from another's use or attempted use of unlawful deadly physical force. *See* A.R.S. § 13-404(A) ("[A] person is justified in . . . using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force."); A.R.S. § 13-405(A)(1) & (2) ("A person is justified in . . . using deadly physical force against another . . . If such person would be justified in threatening or using physical force against the other under § 13-404, and . . . When and to the degree a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force."). Furthermore, pursuant to A.R.S. § 13-405(B), "[a] person has no duty to retreat before . . . using deadly physical force pursuant to this section if the person is in a place where the person may legally be and is not engaged in an unlawful act." *See also* A.R.S. § 13-410; A.R.S. § 13-409; *Garcia*, 826 F.2d at 809-12. "Arizona's justification statute is an affirmative defense, on which Defendants . . . bear the burden of proof . . . In a civil case, that burden [is] by a preponderance of the evidence." *Irizarry v. City of Mesa*, 2013 WL 3223399, *6 (D. Ariz. 2013).

The credible evidence presented at trial reflected that Tidwell was justified in his use of deadly force under the very dangerous and rapidly evolving circumstances of this case. As referenced above, the tragic events of this case were set in motion when the DPD received a call from a homeowner stating that he witnessed an Avalanche being loaded with bundles of drugs near his house. Shortly thereafter, DPD officers spotted the Avalanche being driven by LaMadrid and attempted to get him to voluntarily pull over. Officer Gonzalez turned on his lights and sirens, but instead of pulling over, LaMadrid increased his speed and led Officer Gonzalez and numerous other DPD officers on a high speed chase (which reached speeds of 65 to 70 miles per hour) through the streets of Douglas at approximately noon. A portion of the chase included passing through a school zone in front of an elementary school that was in session at the time. In the midst of his high speed flight from law enforcement, there were two calls on LaMadrid's cell

phone with "Tat" and "Henry" (i.e., LaMadrid's associates) about meeting near a portion of the Fence to help him escape from pursuing officers. Tidwell, who was near the Fence, was alerted to the chase and LaMadrid's likely approach in that direction. As such, Tidwell began slow-rolling his vehicle to an area where the chase may be leading, and as soon as he saw the Avalanche, it made an abrupt turn towards Tidwell, continued driving towards Tidwell at a high rate of speed, and within two seconds collided with Tidwell's vehicle. Upon collision, LaMadrid hopped out of the Avalanche, sprinted towards a nearby ladder on the Fence, and quickly began ascending it. As this was occurring, Tidwell was getting out of his vehicle and drawing his gun, and there were also two individuals on top of the Fence attempting to aid LaMadrid's escape. One of these individuals was reaching down to help LaMadrid over the Fence into Mexico, and the other began hurling rocks the size of softballs or bricks at 50 to 60 miles per hour at Tidwell's head. As the third rock nearly hit Tidwell's head, Tidwell began firing at the rock thrower. However, simultaneous to Tidwell firing at the rock thrower, LaMadrid climbed up the ladder and into the line of fire whereby LaMadrid, the rock thrower, and LaMadrid's other associate were all bunched together at the top of the Fence such that LaMadrid was struck by several rounds that were intended to stop the deadly actions of the rock thrower. While LaMadrid's death from these injuries is tragic, there is no civil liability under Arizona law. A reasonable person in Tidwell's position would believe that he was facing unlawful deadly physical force where rocks the size of softballs or bricks are being thrown from 15 feet away and 10 feet above you directly at your head at 50 to 60 miles per hour. In such circumstances, a reasonable person would also believe that deadly force is immediately necessary to protect himself from that deadly physical force. That is what Tidwell did. He fired several shots at the rock thrower to stop his deadly actions, but at the same time he was firing, LaMadrid was climbing into the line of fire next to the rock thrower, and was struck by bullets intended to stop the rock thrower. Under these circumstances, Tidwell was justified in using deadly force under Arizona's

justification statutes, and consequently there is no civil liability in this case.[13]

Lastly, the Court notes that Plaintiff argues that the justification statutes are inapplicable to Tidwell in this case as force can only be justified when it is "against another" who is directly using force against you. As deadly force was directed against the rock thrower, but LaMadrid was injured in the cross fire of that force, Plaintiff argues LaMadrid was a third party that was injured such that justification is unavailable. This position is unpersuasive.

In similar circumstances, the District of Arizona has previously held that Arizona's justification statutes do apply to bar civil liability. *See Irizarry*, 2013 WL 3223399. In *Irizarry*, the plaintiff sued police officers after he was shot in the midst of a vehicular chase throughout the city of Gilbert, Arizona. *See id.* at *1-2. In the course of fleeing from officers, the plaintiff drove the vehicle and there was a passenger next to him during the pursuit. *Id.* at *1. When his vehicle ran out of gas, the plaintiff and his passenger took cover in the car, and the passenger began firing shots at police officers. *Id.* Officers responded by returning fire. *Id.* The plaintiff was shot several times in the cross fire despite the fact that the officers' shots were directed at the passenger who was firing at the officers. *Id.* While the plaintiff did not fire any shots and did not direct any deadly force at the officers, and the officers' shots were intended and directed at the passenger, the court found that the officers were not subject to civil liability as their actions were justified pursuant to Arizona's justification statutes. *Id.* at *1, *6-8. Similarly, Plaintiff's associate directed deadly force at Tidwell (i.e., rocks the size of softballs and bricks were thrown at full force at Tidwell's head), Tidwell shot at LaMadrid's associate to stop the deadly force aimed at him, and LaMadrid was injured in the cross fire.

In addition, the Court notes that Arizona's justification statutes explicitly cover situations where an "innocent third person" is injured. *See* A.R.S. § 13-401(A) ("Even

---

[13] In addition, the Court alternatively finds that given the credible evidence presented at trial and discussed in this Order, Plaintiff did not show that Tidwell's actions rose to the level of an intentional tort or a negligent tort as a threshold matter.

though a person is justified under this chapter in . . . using . . . deadly physical force against another, if in doing so such person recklessly injures or kills an innocent third person, the justification afforded by this chapter is unavailable in a prosecution for the reckless injury or killing of the innocent third person."). While justification is unavailable where an "innocent third person" is injured or killed, LaMadrid certainly can not be considered an "innocent third person" under the circumstances of this particular case. Even assuming, *arguendo*, that LaMadrid was an "innocent third person" for purposes of Arizona's statutes, Tidwell was not "reckless" in his actions as discussed herein.[14] Arizona's justification statutes are applicable to Tidwell, and bar Plaintiff's claims.

**<u>CONCLUSION</u>**

In light of the evidence that the Court found most credible at trial, and applicable controlling authority, Tidwell's actions were justified under Arizona law. As such, there is no civil liability on the part of Defendant.

While Defendant is not subject to civil liability, it is no reflection on the truly sorrowful circumstances of this case. LaMadrid's family gave heartfelt testimony that he was a good son, a good brother, and a good nephew. The family testified that he was a loving member of the family, a talented athlete, and a gifted singer and musician who brought immense joy to the many loved ones in his life. The family has experienced, and will likely continue to experience for the rest of their lives, an overwhelming sense of loss that has cast a shadow of despair and depression over the entire family. Whatever decision the Court made in this case, it could not begin to fill the immense void left in the family when LaMadrid died. Based on the evidence and law before the Court, there is

---

[14] The Court notes that another statute in Arizona states: "In any civil action, the finder of fact may find the defendant not liable if the defendant proves that . . . the [claimant or] decedent was attempting to commit, committing or immediately fleeing from a felony criminal act and as a result of that act, attempted act or flight the claimant or decedent was at least fifty per cent responsible for the accident or event that caused the claimant's or decedent's harm." A.R.S. 12-712(A). The Court, however, does not address this statute as it is unnecessary in light of the other findings and discussion in this Order.

simply no legal relief that can be provided to the family.

The Clerk of the Court shall enter judgment in favor of Defendant and close the file in this case.

Dated this 25th day of April, 2016.

Honorable James A. Soto
United States District Judge